# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AK METALS, LLC,<br><br>                    Plaintiff,<br><br>     v.<br><br>NORMAN INDUSTRIAL MATERIALS, INC.; DOES 1 TO 100, inclusive,<br><br>                    Defendants. | CASE NO. 12cv2595 - IEG (WVG)<br><br>**ORDER:**<br><br>**(1) DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**AND**<br><br>**(2) DENYING PLAINTIFF'S MOTION TO EXPEDITE DISCOVERY**<br><br>**[Doc. No. 10]** |

Presently before the Court are the motions of Plaintiff AK Metals, LLC ("Plaintiff") for a preliminary injunction and to expedite discovery. [Doc. No. 10, Pl.'s Mot.] For the reasons below, the Court **DENIES** both motions.

## BACKGROUND

Plaintiff is a distributor of metal supplies, services, and materials. [Doc No. 1-1, Compl. ¶¶ 7-8.] Plaintiff alleges that its registered fictitious business name is "Escondido Metal Supply" and that it has continuously used the trade names and trademarks "AK Metals" and "Escondido Metal Supply" at least since 1998. [Id. ¶¶ 1, 7-8.]

Plaintiff alleges that Defendant Norman Industrial Materials, Inc. ("Defendant"), a direct competitor, "has engaged in a number of activities that infringe upon the trade names and trademarks of [Escondido Metal Supply] which constitute false advertising and unfair

competition." [Id. at ¶¶ 11, 13.] Plaintiff alleges that Defendant is using the trade name, "Escondido Metal Supply" and variations thereof, without its authorization. [Id. ¶ 4.] More specifically, Plaintiff states that Defendant is using "Escondido Metal Supply" as a keyword for Internet advertising, including in Google's AdWords program. [Id. ¶¶ 4, 13.] Plaintiff alleges that when a potential consumer searches for "Escondido Metal Supply" or similar variations, Defendant's advertisement appears as a sponsored link (separate from the search results themselves). [Id. ¶¶ 13-14; Doc. No. 10-7, Exhibit.] Plaintiff alleges that Defendant uses "Escondido Metal Supply" in the header and text of its advertisement. [Doc. No. 1-1, Compl. ¶ 14.] Plaintiff also believes that "Defendant's unauthorized use of [Escondido Metal Supply] . . . is likely to confuse, mislead, and deceive consumers as to the source of products available through [Defendant's website]." [Id. ¶ 15.]

On October 3, 2012, Plaintiff filed a Complaint in the California Superior Court for the County of San Diego. [Doc. No. 1-1, Compl.] On October 24, 2012, Defendant removed the action to this Court. [Doc. No. 1, Notice of Removal.] The following causes of action are alleged in the Complaint: (1) common law trademark infringement; (2) federal unfair competition and false advertising in violation of 15 U.S.C. §§ 1114 and 1125(a); and (3) statutory unfair competition and false advertising under California Business and Professions Code §§ 17200 and 17500, *et seq.* [Doc. No. 1-1, Compl.]

After the filing of the Complaint, Defendant informed Plaintiff in a letter that it had "paused the link on 'escondido metal supply,' without admission of wrongdoing, as a sign of good faith and in the hope of working out a resolution to these issues." [Doc. No. 10-8, Oct. 31 Letter from Def. at 5.] Defendant stated that all of its sponsored ads had been stopped for Google searches of "Escondido Metal Supply." [Doc. No. 20, Def.'s Opp. at 7.] Defendant also stated that although searches for misspellings of "Escondido Metal Supply" still display Defendant's advertisement, the text of the ad header does not read "Escondido," and the text clearly identifies Defendant. [Doc. No. 10-8, Oct. 31 Letter from Def. at 4.]

On December 19, 2012, Plaintiff filed an ex parte motion for a temporary restraining order ("TRO"), for a preliminary injunction, and to expedite discovery. [Doc. No. 10, Pl.'s Mot.] In its

ex parte application for a TRO, Plaintiff requested that the Court order Defendant to "immediately cease any all and all [sic] use of [P]laintiff's trademark and business and trade name Escondido Metal Supply, or confusingly similar variations therefor, in any and all of its advertising, including but not limited to: (A) As a 'keyword' in Internet keyword advertising programs, including but not limited to, Google's AdWords program; (B) In the header and text of the resulting sponsored links that appear when someone types in "ESCONDIDO METAL SUPPLY" or a variation thereof as a search term in an Internet search engine." [Doc. No. 10, Pl.'s Mot. at 1-2.]

This Court denied the application for a TRO on December 21, 2012 [Doc. No. 12, Order Denying TRO], but ordered Defendant to show cause why Plaintiff's motions for a preliminary injunction and to expedite discovery should not be granted. [Id.] Defendant filed a response in opposition on January 7, 2013. [Doc. No. 20, Def.'s Opp.] Plaintiff filed its reply on January 14, 2013. [Doc. No. 21, Pl.'s Reply.] Defendant filed a sur-reply on January 21, 2013. [Doc. No. 22, Def.'s Sur-Reply.][1]

**DISCUSSION**

**I.    Motion for Preliminary Injunction**

A plaintiff seeking a preliminary injunction must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008). Alliance for the Wild Rockies v. Cottrell explicitly found that Winter did not abrogate the Ninth Circuit's "serious questions" test for preliminary injunctions "when applied as part of the four-element Winter test." 632 F.3d 1127, 1131-32 (9th Cir. 2011). Therefore, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the Winter test are also met." Id. at 1132 (internal quotation marks omitted). The burden is on the plaintiff seeking the preliminary injunction to establish the four elements. Winter, 555 U.S. at 20.

---

[1] Although Defendant did not seek leave of the Court to file a sur-reply, the Court deems the sur-reply appropriate because Plaintiff raises several new arguments in its reply brief which it did not raise in its motion. [See Doc. No. 10, Pl.'s Mot.; Doc. No. 21, Pl.'s Reply.]

**A.     Likelihood of Success on the Merits**

In the application for a TRO and motion for a preliminary injunction, Plaintiff argues that it will prevail on the merits of its federal trademark infringement claim under 15 U.S.C. § 1114, and on its unfair competition and false advertising claims under 15 U.S.C. § 1125(a) and California Business and Professions Code §§ 17200 and 17500. The Court addresses each claim in turn.

**1.     Trademark Infringement Under Lanham Act, 15 U.S.C. § 1114**

To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party must demonstrate that (1) it has a protectable ownership interest in the mark; and (2) the defendant's use of the mark is likely to cause consumer confusion. Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1144 (9th Cir. 2011).[2] The Court first addresses the likelihood of consumer confusion.

The Ninth Circuit has identified eight relevant factors to determine whether consumers would likely be confused by related goods: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. Network Automation, Inc., 638 F.3d at 1145 (citing AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979)). This list of factors is not exhaustive; "[o]ther variables may come into play depending on the particular facts presented." Id. at 348 n.11. Further, "[t]he Sleekcraft factors are intended as an adaptable proxy for consumer confusion, not a rote checklist." Network Automation, Inc., 638 F.3d at 1145. The Ninth Circuit has also cautioned against rigidity when applying the law in the

---

[2] A prerequisite to the Lanham Act analysis is the requirement of federal jurisdiction. Neither party contests jurisdiction. The Court's jurisdiction over trademark cases rests on the Commerce Clause. Playboy Enters., Inc. v. Netscape Commc'ns Corp., 354 F.3d 1020, 1024 n.11 (9th Cir. 2004). The Ninth Circuit has held that "the use of a trademark as a search engine keyword that triggers the display of a competitor's advertisement is a 'use in commerce' under the Lanham Act." Network Automation, Inc., 638 F.3d at 1145-46. Although the mark in question in the instant case is not a registered trademark, the Ninth Circuit's reasoning regarding "use in commerce" is nevertheless applicable. Therefore, the Court finds that Defendant used the mark in commerce and that the Court properly has jurisdiction over the matter.

1  context of the Internet, which instead requires a flexible approach. Id. at 1145-46, 49;[3] see
2  also Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1054 (9th Cir. 1999).

3  For alleged trademark infringement in the context of Internet advertising, the Ninth Circuit
4  has stated that the following Sleekcraft factors are most relevant to the analysis of the likelihood of
5  confusion: "(1) the strength of the mark; (2) the evidence of actual confusion; (3) the type of
6  goods and degree of care likely to be exercised by the purchaser; and (4) the labeling and
7  appearance of the advertisements and the surrounding context on the screen displaying the results
8  page." Network Automation, Inc., 638 F.3d at 1154. The Court addresses these four factors
9  below.

### a. Strength of the Mark

11  "The stronger a mark—meaning the more likely it is to be remembered and associated in
12  the public mind with the mark's owner—the greater the protection it is accorded by the trademark
13  laws." Brookfield, 174 F.3d at 1058. "This factor is probative of confusion here because a
14  consumer searching for a generic term is more likely to be searching for a product category."
15  Network Automation Inc., 638 F.3d at 1149.

16  Two relevant measures to assess the strength of a mark are conceptual strength and
17  commercial strength. Id. "Conceptual strength involves classification of a mark 'along a spectrum
18  of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or
19  fanciful.'" Id. (quoting Brookfield, 174 F.3d at 1058). "A mark's conceptual strength depends
20  largely on the obviousness of its connection to the good or service to which it refers." Fortune
21  Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1032-33 (9th Cir.
22  2010). "The less obvious the connection, the stronger the mark, and vice versa." Id. at 1033.
23  "[A] mark is more likely to be suggestive [rather than descriptive] if it passes the imagination test,

---

[3] In Network Automation, the Ninth Circuit considered "whether the use of another's trademark as a search engine keyword to trigger one's own product advertisement violates the Lanham Act." Network Automation, Inc., 638 F.3d at 1148. The instant case is different only because "Escondido Metal Supply" is not a registered trademark of Plaintiff. In Network Automation, the Ninth Circuit found that three of the Sleekcraft factors, (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the simultaneous use of the Web as a marketing channel, which are often used in trademark infringement cases related to the Internet, should not be rigidly applied in *all* cases pertaining to trademark infringement on the Internet. Rather, the Ninth Circuit held that these factors are most appropriate for domain name disputes, which is not at issue in the case at hand. Id. at 1148-49.

1  which asks whether the mark 'requires a mental leap from the mark to the product.'" Id. (quoting
2  Brookfield Commc'ns, 174 F.3d at 1058).

3        "Commercial strength is based on 'actual marketplace recognition,' and thus 'advertising
4  expenditures can transform a suggestive mark into a strong mark.'" Network Automation, Inc.,
5  638 F.3d at 1149 (quoting Brookfield, 174 F.3d at 1058).  However, because commercial strength
6  is an evidence-intensive inquiry, the Ninth Circuit has held that it is not necessary to consider this
7  measure at the preliminary injunction stage.  Network Automation, 638 F.3d at 1150.  Therefore,
8  the Court does not consider the mark's commercial strength at this stage.

9        Plaintiff concedes that the conceptual strength of the mark "may not alone tip this factor in
10 Plaintiff's favor." [Doc. No. 21, Pl.'s Reply at 7.]  However, Plaintiff argues that its marketing
11 efforts "enhance the strength of [its] mark to tip this factor in Plaintiff's favor." [Id.]

12       The Court finds that the conceptual strength of the mark does not favor Plaintiff.  In
13 Network Automation, the Ninth Circuit held that the mark in question was both the plaintiff's
14 product name and a suggestive federally registered trademark, and that therefore, "consumers
15 searching for the term are presumably looking for its specific product, and not a category of
16 goods." Network Automation, 638 F.3d at 1150.  In the instant case, "Escondido Metal Supply" is
17 an unregistered mark, and therefore, it is not "inherently distinctive." See id.  Furthermore,
18 "Escondido Metal Supply" is not a fanciful or suggestive name; rather, it is a combination of a
19 geographic term and a description of a category of goods.  It shows an obvious connection to the
20 goods to which it refers, lessening the strength of the mark.  See Fortune Dynamic, Inc., 618 F.3d
21 at 1033.  Further, "Escondido Metal Supply" does not require a mental leap from the mark to the
22 products, which intimates that it is a descriptive mark, rather than a suggestive one.  See id.
23 Accordingly, the Court finds that the strength of the mark does not favor Plaintiff.

24       **b.    Evidence of Actual Confusion**

25 "[A] showing of actual confusion among significant numbers of consumers provides strong
26 support for the likelihood of confusion." Playboy, 354 F.3d at 1026.  However, "actual confusion
27 is not necessary to a finding of likelihood of confusion under the Lanham Act." Academy of
28 Motion Picture Arts & Sciences v. Creative House Promotions, Inc., 944 F.2d 1446, 1456 (9th

Cir.1991). Indeed, "[p]roving actual confusion is difficult . . . and the courts have often discounted such evidence because it was unclear or insubstantial." Sleekcraft, 599 F.2d at 352. The Ninth Circuit has held that this factor's importance is diminished at the preliminary injunction stage due to the dearth of evidence generally available at this stage of the litigation. Network Automation, 638 F.3d at 1151.

In the instant case, the Court should not give significant weight to this factor due to a sparse record. Plaintiff only cites one instance of a consumer potentially being confused [Doc. No. 21, Pl.'s Reply at 8; Doc. No. 10-3, Decl. of Helen Robles Cuevas ¶¶ 5-6], which the Court finds is not sufficient evidence of actual confusion. Plaintiff also cites Defendant's statement that at least 3,846 people searched "Escondido Metal Supply" during an unspecified period of time, and during that time, at least 603 clicked on Defendant's advertisement. At least 35 of the 603 people have "provided something of value to Defendant. [Id.] However, Plaintiff fails to explain how this information shows customer confusion. Perhaps the customer intended to search for Defendant on the Internet. Due to the dearth of evidence, the Court finds that Plaintiff has not produced sufficient evidence of actual confusion.

### c.    Type of Goods and Degree of Care

"Low consumer care . . . increases the likelihood of confusion." Playboy, 354 F.3d at 1028. "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. . . . When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely. Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." Sleekcraft, 599 F.2d at 353 (citations omitted).

In the context of the Internet, a sophisticated consumer "exercising a high degree of care is more likely to understand the mechanics of Internet search engines and the nature of sponsored links, whereas an un-savvy consumer exercising less care is more likely to be confused." Network Automation, Inc., 638 F.3d at 1152. However, the Ninth Circuit has cautioned that "the degree of care analysis cannot begin and end at the marketing channel." Id. Courts must also consider "the nature and cost of the goods, and whether the products being sold are marketed primarily to expert

1  buyers." Id. (internal quotation omitted). The Ninth Circuit has also recognized that "the default
2  degree of consumer care is becoming more heightened as the novelty of the Internet evaporates
3  and online commerce becomes commonplace," and that consumers searching for expensive
4  products online are even more sophisticated. Id. (citing Toyota Motor Sales v. Tabari, 610 F.3d
5  1171 (9th Cir. 2010)).

6  In its briefing, Plaintiff provides only two sentences regarding this factor: "The products
7  and services consist of metal (steel, aluminum, copper, brass, etc.) in various shapes and sizes and
8  being [sic] distributed to purchasers. Consumers may not take any additional measures to assure
9  the source of the metal other than that of a prudent buyer." [Doc. No. 21, Pl.'s Reply at 9.]
10 Plaintiff provides no further explanation. Plaintiff does not provide any information on the cost of
11 the goods and the types of customers that it targets with its marketing. Accordingly, the Court
12 finds that Plaintiff fails to show that the type of goods and degree of care exercised by consumers
13 supports a finding of customer confusion.

### d.     Appearance of Advertisements and Surrounding Context

15 The Ninth Circuit has identified other factors that are relevant in the Internet advertising
16 context: the appearance of the advertisements and their surrounding context. Network
17 Automation, Inc., 638 F.3d at 1153-54. These factors turn on the text of the actual advertisements,
18 in addition to whether advertisements are partitioned from the search results. Id. at 1154.

19 In another internet advertising case, the Ninth Circuit when reviewing a motion for
20 summary judgment found that there were genuine issues of material fact with respect to whether
21 consumers were likely to be confused because the linked advertisements were unlabeled, and were
22 therefore more likely to mislead customers into believing they had followed a link to the
23 company's website for which they were originally searching. Playboy, 354 F.3d at 1025-31.

24 Plaintiff argues that "Escondido Metal Supply" appeared in the actual text of the
25 advertisements which were displayed when an individual searched for "Escondido Metal Supply."
26 [Doc. No. 21, Pl.'s Reply at 9.] Plaintiff also argues that both its and Defendant's paid
27 advertisements appeared in the same section for "sponsored ads." Because the parties'
28 advertisements appear in the same section of the web page, Plaintiff argues that the likelihood for

customer confusion is greater in the instant case than in Network Automation, where the Ninth Circuit compared paid listings and non-paid search results. [Id. at 10.]

Defendant states that its ads no longer include "Escondido Metal Supply" in the ad header, which had previously happened because of an automatic process that inserted the search terms into the ad headers. [Doc. No. 20, Def.'s Opp. at 7; Doc. No. 10-8, Oct. 31 Letter from Def. at 4-5.] In fact, Defendant states that all of its sponsored ads have been stopped for Google searches of "Escondido Metal Supply." [Id.; Doc. No. 20, Def.'s Opp. at 7; Doc. No. 20-1, Decl. of Megan Humpal at 3, 13, 15.] Defendant clarified at oral argument on the motion for a preliminary injunction on January 28, 2013 that its advertisements still display if an individual misspells "Escondido Metal Supply" during a search. Defendant further explained that the text that appears above the sponsored advertisements reads: "Ads *related to* Escondido Metal Supply," as opposed to "Ads *for* Escondido Metal Supply" (emphasis added).

Although the text of Defendant's advertisements could have been misleading if the text included "Escondido Metal Supply" in the header, Defendant states that this is no longer the case. [Doc. No. 20, Def.'s Opp. at 7; Doc. No. 10-8, Oct. 31 Letter from Def. at 4-5.] Because the ads are clearly separated from the search results, unlike in Playboy, and are labeled as ads "related to" the search terms, this factor does not strongly support Plaintiff.

In conclusion, the Court finds that Plaintiff has not met its burden to show the likelihood of customer confusion. None of the four factors the Ninth Circuit has identified as most important in the Internet advertising context favor Plaintiff. See Network Automation, Inc., 638 F.3d at 1154. Accordingly, the Court need not consider the remaining Sleekcraft factors. Because Plaintiff is unable to demonstrate the likelihood of customer confusion, Plaintiff is not likely to succeed on the merits, nor are there serious questions going to the merits of its trademark infringement claim under § 1114.

**2.     Unfair Competition and False Advertising in Violation of 15 U.S.C. § 1125(a)**

In its motion for a preliminary injunction, Plaintiff also argues that it can show likelihood of success on the merits on its unfair competition and false advertising claims in violation of 15 U.S.C. § 1125(a). [Doc. No. 10-1, Pl.'s Mot. at 14.]

Section 1125(a) provides that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

15 U.S.C. § 1125(a).

In its Complaint, Plaintiff alleges that Defendant's unauthorized use of "Escondido Metal Supply" "constitute[s] trademark infringement in violation of 15 U.S.C. §§ 1114 and 1125(a)." [Doc. No. 1-1, Compl. ¶ 27.] As Defendant points out, Plaintiff does not allege false advertising in the body its Complaint; rather, Plaintiff only states "false advertising" in its header. [Id. at 6; Doc. No. 20, Def.'s Opp. at 16.] In its motion, Plaintiff only states that "[P]laintiff is likely to succeed on the merits of [a] false advertising claim because [D]efendant has intentionally and deceptively included [P]laintiff's mark in its Internet advertising." [Doc. No. 10-1, Pl.'s Mot. at 14.] Therefore, Plaintiff argues that Defendant's use of "Escondido Metal Supply" "is likely to cause, and has caused, confusion among the consumers as to the products and services offered by [D]efendant and [P]laintiff." [Id.] Plaintiff does not address the likelihood of success on the merits of the § 1125(a) claim in its reply. [See Doc. No. 21, Pl.'s Reply.]

For the same reasons the Court found that Plaintiff is unable to show likelihood of consumer confusion for the trademark infringement claim, the Court also finds that Plaintiff is unable to show likelihood of confusion for the § 1125(a) claim. Accordingly, Plaintiff is unable to show likelihood of success on the merits or serious questions going to the merits of the § 1125(a) claim.

### 3. Unfair Competition and False Advertising in Violation of Business and Professions Code §§ 17200 and 17500

Section 17200 defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200; see also Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999). Because the statute is written in the disjunctive, "it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." Podolsky v. First Healthcare Corp., 50 Cal. App. 4th 632, 647

1  (1996). "By proscribing "any unlawful" business practice, section 17200 'borrows' violations of
2  other laws and treats them as unlawful practices that the unfair competition law makes
3  independently actionable. Id. (internal quotations omitted). "An unlawful business practice under
4  [this section] is anything that can properly be called a business practice and that at the same time is
5  forbidden by law." Morgan v. AT&T Wireless Servs., Inc., 177 Cal. App. 4th 1235, 1254 (2009)
6  (internal quotation omitted). Regarding unfair competition in the context of direct competitors, the
7  California Supreme Court has explained that "any finding of unfairness to competitors under [this
8  section must] be tethered to some legislatively declared policy or proof of some actual or
9  threatened impact on competition." Cel-Tech Commc'ns, 20 Cal. 4th at 186-87. "A fraudulent
10 business practice is one in which members of the public are likely to be deceived." Morgan, 177
11 Cal. App. 4th at 1254 (internal quotation omitted).

12      Plaintiff argues that its claims under these statutory sections are likely to succeed on the
13 merits "due to [D]efendant's use of [P]laintiff's mark ["Escondido Metal Supply"] being unlawful,
14 unfair, and fraudulent. [Doc. No. 10, Pl.'s Mot. at 15.] Plaintiff argues, without further
15 explanation, that Defendant's use of the mark is unlawful because it violates state and federal
16 trademark common law. [Id.] Plaintiff then states that Defendant's use of its mark in Internet
17 advertising is unfair "because of [sic] the harm to [P]laintiff includes, but is not limited to, loss of
18 sales, customers, and goodwill [and] greatly outweighs ANY benefit of defendant's use." [Id.]
19 Finally, Plaintiff argues that Defendant's use of the mark is fraudulent because members of the
20 public are likely to be deceived. [Id.]

21      The Court finds that Plaintiff is unable to show likelihood of success on the merits for
22 unfair competition and false advertising in violation of §§ 17200 and 17500. First, Plaintiff is
23 unable to show a likelihood of success on the merits that Defendant's use of the mark is unlawful
24 because Plaintiff has not provided any arguments to support its contention that Defendant's actions
25 violate state and federal common law. Second, Plaintiff is unable to show a likelihood of success
26 on the merits that Defendant's use of the mark is unfair because Plaintiff does not even address
27 actual or threatened impact on competition. Finally, Plaintiff is unable to show likelihood of
28 success on the merits that Defendant's use of the mark is fraudulent because Plaintiff is unable to

1  show that members of the public will likely be confused, as discussed above, much less deceived.
2  Accordingly, the Court finds that Plaintiff is unable to show likelihood of success on the merits or
3  serious questions going to the merits of the unfair competition and false advertising claims under
4  §§ 17200 and 17500.

**B.     Irreparable Harm**

Even if Plaintiff is able to demonstrate a likelihood of success on the merits, Plaintiff is unable to show irreparable harm. The second element that a Plaintiff must demonstrate in order to obtain a preliminary injunction is that it is likely to suffer irreparable harm in the absence of preliminary relief. Winter, 555 U.S. 7. "Typically, monetary harm does not constitute irreparable harm" because "economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award." California Pharmacists Ass'n v. Maxwell-Jolly, 563 F.3d 847, 851-52 (9th Cir. 2009) (emphasis omitted); see also American Trucking Ass'ns., Inc. v. City of Los Angeles, 559 F.3d 1046, 1057 (9th Cir. 2009). A loss of goodwill and reputation, on the other hand, may support injunctive relief. Id. However, a preliminary injunction cannot be issued to prevent a speculative injury; rather, a plaintiff must show that the alleged threat of irreparable harm is actual and imminent. Regents of Univ. of Cal. v. Am. Broadcasting Cos., Inc., 747 F.2d 511, 523-24 (9th Cir. 1984) (citing New York v. Nuclear Regulatory Comm'n, 550 F.2d 745, 755 (2d Cir. 1977)).

Additionally, "[u]nexplained delay in seeking 'emergency' injunctive relief undercuts a claim that an injunction is necessary to prevent immediate and irreparable injury." Dahl v. Swift Distrib., Inc., 2010 WL 1458957, at *3 (C.D. Cal. April 1, 2010) (citing Miller v. Cal. Pac. Med. Ctr., 991 F.2d 536, 544 (9th Cir. 1993) ("Plaintiffs' long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.")). "Although delay by itself is not a determinative factor in whether the grant of interim relief is just and proper," the delay is "nonetheless relevant in determining whether relief is truly necessary." Miller, 991 F.2d at 544 (internal quotation and citation omitted).

Plaintiff first argues that "[i]n the trademark context, threatened loss of prospective customers and goodwill constitute irreparable harm," citing Stuhlbarg Intern. Sales Co., Inc. v.

John D. Brush and Co., Inc., 240 F.3d 832 (9th Cir. 2001). [Doc. No. 21, Pl.'s Reply at 2.] Plaintiff says that its goodwill and reputation will be damaged as a result of consumers confusing its services and goods with that of Defendant's. [Id. at 3.] Plaintiff also attempts to explain his almost two month delay in filing his application for a TRO and motion for a preliminary injunction. [Id. at 4.] Plaintiff states that the parties were engaged in settlement negotiations for several weeks after Defendant removed the case to this Court. [Id.] Plaintiff also states that it delayed filing his application for a TRO because Plaintiff's attorney had a trial in state court in early December, which the attorney believed could have interfered with potential oral arguments on the TRO. [Id.]

Plaintiff does not make a showing that the harm it will suffer as a result of Defendant's allegedly infringing conduct is actual and imminent. See Regents of Univ. of Cal., 747 F.2d at 523-24. Rather, Plaintiff only speculates that there is a risk that consumers may confuse Plaintiff's goods and services with that of Defendant's, which may result in a loss of reputation and goodwill. [Doc. No. 21, Pl.'s Reply at 3.] One of Plaintiff's managing members, Marc Corwin, summarily states that Defendant's use of "Escondido Metal Supply" "is potentially fatal to [Plaintiff]'s ongoing business, its goodwill, and is an unfair business practice in the marketplace since it is utilizing our trademark to steal profits that would normally be earned by [Plaintiff]." [Doc. No. 10-2, Decl. of Marc Corwin ¶ 13.]

The facts in Stuhlbarg, which is cited by Plaintiff to support its argument, are different from the present case. In Stuhlbarg, Plaintiff Sisco sought a TRO and preliminary injunction to enjoin Defendant Brush from hindering Plaintiff's importation of safes that Defendant claimed infringed its trademark. The U.S. Customs Service had detained Plaintiff Sisco's safes which were due to its new customers. Stuhlbarg Intern. Sales Co., Inc., 240 F.3d at 834-36. The district court concluded, and the Ninth Circuit affirmed, that Plaintiff would suffer irreparable harm because Defendant Brush was using the U.S. Customs Service to detain Plaintiff Sisco's goods, which were earmarked for initial orders by new customers. Id. at 840-41. In that context, the district court had found that Plaintiff Sisco had presented evidence of threatened loss of prospective customers, and the accompanying goodwill and revenue. Id. at 841.

In this case, however, the harm that Plaintiff alleges is more general and speculative. In Stuhlbarg, the plaintiff pointed to specific customers in relation to which it could lose goodwill and reputation. Plaintiff here only alleges that "there is a risk that the public perception of Plaintiff's goods and services will be diminished" because "Plaintiff has no control over the quality of service or goods Defendant offers." [Doc. No. 21, Pl.'s Reply at 3.] Plaintiff states that "[i]f Defendant's goods and services are inferior to Plaintiff's, this would likely result in consumers developing a poorer opinion of Plaintiff's products. [Id.] Additionally, Plaintiff admits that "the damage to Plaintiff's goodwill and reputation cannot be quantified, as it is unascertainable how many potential customers Plaintiffs [sic] will lose from their [sic] loss of reputation and goodwill." [Id.] Therefore, Plaintiff merely speculates that if consumers are confused between Plaintiff and Defendant, and Defendant's goods are inferior, then *some* consumers *may* develop a poorer opinion of Plaintiff's products. This harm is not sufficient to warrant a preliminary injunction, which requires more than speculative injury. Regents of Univ. of Cal., 747 F.2d at 523-24.

In addition, the Court finds any harm Plaintiff would suffer without the preliminary injunction is not immediate, despite counsel's attempts to justify the almost two month delay. First, counsel does not explain how the settlement negotiations affected any potential harm suffered by his client. Certainly, Plaintiff would have continued to suffer the harm that it alleges it now suffers in the weeks that the negotiations were ongoing. Plaintiff also could not have assumed that settlement negotiations would be successful, thereby negating the need for a TRO and preliminary injunction. Second, counsel must recognize that the need for expediency and the potential irreparable harm to his client exist regardless of any outside constraints in his schedule. Therefore, Plaintiff's delay in filing the motion for emergency relief weighs against the immediacy of the harm. See Miller, 991 F.2d at 544.

In light of the above, Plaintiff cannot show any harm it would suffer is imminent and actual if the injunction does not issue. Because Plaintiff is unable to show likelihood of success on the merits and irreparable harm, the Court will not address the remaining elements outlined by Winter, the balance of equities and the public interest, which are also necessary for the issuance of a

1 preliminary injunction. In light of the foregoing, the Court **DENIES** Plaintiff's motion for a preliminary injunction.

## II.     Motion to Expedite Discovery

Rule 26(d) of the Federal Rules of Civil Procedure provides that formal discovery will not begin until after the parties have conferred as required under Rule 26(f). See Fed. R. Civ. P. 26(d); see e.g., American LegalNet, Inc. v. Davis, 673 F.Supp.2d 1063, 1066 (C.D. Cal. 2009). However, a court may permit expedited discovery before the Rule 26(f) conference if the party seeking it shows good cause. See, e.g., id.

Courts should "examine the discovery request . . . on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." Id. (internal quotation omitted). "Factors commonly considered in determining the reasonableness of expedited discovery include, but are not limited to: (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." Disability Rights Council of Greater Washington v. Washington Metro. Area Transit Authority, 234 F.R.D. 4, 6 (D.D.C. 2006).

Plaintiff requests expedited discovery "focused exclusively on recovering only data held by either [D]efendant, its internet advertising program provider, or its in-house or independently contracted internet advertising technician and/or webmaster which will provide detailed analysis of the scope of use of [P]laintiff's trade names and trademark by [D]efendant." [Doc. No. 10-1, Def.'s Mot. at 21.] In its motion, Plaintiff stated that it seeks to expedite discovery in order to avoid being unfairly prejudiced at the Early Neutral Evaluation ("ENE") Conference. [Id.] During the January 28, 2013 hearing on this motion, Plaintiff also stated that it requests expedited discovery to pursue settlement discussions, which it claims would benefit both the Court and the parties by potentially expediting the litigation. Plaintiff explained that it currently has to rely on Defendant's representations regarding its actions because it does not have access to this information.

Defendant opposes the motion on several grounds. First, Defendant has ceased the

allegedly infringing conduct. Therefore, Plaintiff cannot show good cause why it cannot wait until the Rule 26(f) conference for this discovery, and why it immediately needs this information. Second, Plaintiff's justification for the expedited discovery, to avoid unfair prejudice at the ENE Conference, no longer applies since the ENE Conference was scheduled for January 7, 2013. And finally, Plaintiff's request for discovery is neither specific about the discovery sought or from whom it is sought. Plaintiff also does not provide a time line for the proposed discovery with its motion. [Doc. No. 20, Def.'s Opp. at 22-23.]

The Court finds that Plaintiff has failed to show good cause for expedited discovery at this time. However, the parties may want to take the matter up with the Magistrate Judge at their next conference.

## CONCLUSION

For the reasons above, the Court **DENIES** Plaintiff's motions for a preliminary injunction and to expedite discovery.

**IT IS SO ORDERED.**

**DATED:** January 31, 2013

**IRMA E. GONZALEZ**
**United States District Judge**